For today, Nester v. Textron, Incorporated Let's let everyone get all settled first. Okay, Mr. Eadie. May it please the Court. My name is Michael Eadie. I represent the appellant Textron in this appeal. Now, this is a product liability appeal. The jury below found in favor of the consumer plaintiff on a single theory, and that theory was design defect. Now, having found the consumer plaintiff to also be comparatively responsible for causing the occurrence of injuries, they proceeded to answer a comparative fault question or a comparative responsibility question, assigning 50% of the responsibility on the manufacturer and 50% of the responsibility on the consumer plaintiff. Under Texas law, this was a close case. The assignment of 1% responsibility more on the plaintiff would have barred the Nester's recovery completely. It was a very close case. The first case I ever tried was one of the early comparative negligence cases, and I was defending, and it was 51-49. So that's what the jury said. So I know exactly what you're talking about. It is a close case, and there's things that you can point to on why the jury reached the decision it did on the design defect question and why they had a 1% swing on that comparative fault question. And they generally fall into four categories. One, not instructing the jury completely on all elements of a safer alternative design. Number two, a shotgun approach to proving safer alternative design coupled with a general verdict. Three, inflammatory other incident evidence. And four, the allowance of Textron's net worth and financial information in the course of the first part of the trial. The law doesn't require perfect trials, though, does it? Just fair ones. It doesn't require a perfect trial, but it requires a fair trial. But here, all of these errors can point to a reason to reverse the judgment and send it back. Well, in granulating the jury issue, I have some sympathy with you. When I was on the Supreme Court of Texas, I argued that that's what we should do. But on the criminal side, unless it's an element of the offense, a defendant can be convicted on one of many theories, and the jury doesn't have to agree on which it is. I mean, why should we treat civil cases differently than criminal cases? The law is developed differently for whatever reason. And we go back to Maryland v. Baldwin on that particular principle. And Maryland v. Baldwin was a civil case. And cases decided by the United States Supreme Court subsequent to that case followed that. And it followed all the way until it was decided in the Griffin case that's decided by both parties, and that was a criminal case, and the author opinion was Justice Scalia. He didn't discuss Maryland v. Baldwin, did not discuss the Baldwin principle, did not discuss civil cases. Subsequent to that case, there was some discussion on whether or not the Griffin case is going to be used in the civil context. And there's some discussion in the Nestor's brief on that issue. There's some discussion in the footnotes of various opinions from this court. But ultimately, this court went back to the Baldwin principle, as it had before, and applied that in the Muth case, and most recently broadly applied it in the McKaig case. So it's developed differently in the civil system than the criminal system, but the Baldwin principle is alive and well in this circuit. And under the Baldwin principle, if you submit more than one theory to the jury, and you cannot tell if the jury relied upon an invalid theory or one not supported by the evidence, it requires sending the case back. And in this particular appeal, there's an easy target for that. Again, in this case, the way it was tried, there was not one claim safer alternative design. There was four. Now, it's an interesting history, because when the trial starts, there's only one. Because the expert for the Nestor's has been precluded on giving expert testimony on anything but disengaging the linkage between the accelerator and the parking brake, the kickoff feature. But the Nestor's insisted on developing three more alternate designs,  and those others were a separate hand-operated brake, a pedal guard, and an operator-present switch. This kind of switch in the seat where you sit on the seat, you get off the seat, the engine turns off. So they had all of these different theories. Now, not all of them were supported by sufficient evidence, and the easiest one to pick off in this bunch is this separate hand-operated brake. Now, the separate hand-operated brake notion comes from this idea it's used on bigger carts. The Nestor's cart was a two-cylinder, 11-horsepower, 15-mile-an-hour cart. It was a light-duty cart. There are bigger utility carts that you can buy that are in that $13,000, $14,000 range, according to the testimony in the record, that have hydraulic brakes. So the idea being, well, if they exist over here, well, we can just take this particular brake and we can put it into the Nestor's cart. But the Nestor's cart had a mechanical brake system, which is different than a hydraulic brake system. And so the testimony that came from the witnesses for Textron said, no one knew how to adapt that technology to the Nestor's cart. It would be a completely different design. The vehicle would have to be redesigned. It would be more expensive. It would be a totally different vehicle. It would be significantly changed. And again, the Nestor's cart was like $4,800 brand new. Now, this completely changes the cart completely. So where was the testimony of what it would cost to adapt that technology to their cart? And there wasn't any. And, in fact, the testimony that I've just referred to indicates that it would have been prohibited. So that's the easy one to pick off there. Under Texas law, a consumer must prove that the alternative design is both technologically and economically feasible, and that particular design was never proven to be economically feasible. Now, the first issue that was briefed is that- Was it brought to the- All the designs were argued. It was argued that they had not proven the alternative designs. It was more broadly argued a tradeoff of the benefits between comparing the Textron design with the designs advocated by the Nestor's. Well, but my question was on the alternative design of the hydraulic brake. Was it pointed out that that was not economically feasible? It was pointed out that no one knew how to do it. And if you didn't know how to do it, you couldn't even draw a design to it. And if you can't draw a design or have something to price, you don't even have any evidence of whether or not it's economically feasible. So it was argued you didn't know how to do it. No one knew how. There was no plan to do it. And so you're missing all of the elements that would lead into being economically feasible. And, yes, it was argued that the carts that had those particular handbrakes were a higher-end cart and cost a lot more money. So that was presented. But the other aspect that I mentioned is the tradeoffs. And this was part of the first issue that was argued in the briefing. And that's this issue of the failure to instruct the jury on all elements of safer alternative design. The Texas Supreme Court recently, in, like, 2016, outlined the four things that a plaintiff must prove on safer alternative design. I thought the pattern jury charge was used here. The pattern jury charge was used here, and this is the inconsistency that we see. The pattern jury charge list tells the jury that they simply need to find that there's a safer alternative design, and then it tells them what a safer alternative design is. And that's one, other than the manufacturer's design, that wouldn't reasonable probability have prevented or significantly reduced the risk of occurrence of the injury in question without substantially impairing the product's utility and was economically and technologically feasible. There's really three things in there. And if we take those three things and we compare it to what the Texas Supreme Court says must be proven, we find that there's actually four things. Can you point to any case where we've reversed a verdict where the pattern charge was used? Where the pattern charge was used? Not this court. The Texas Supreme Court has, applying, I would assume, a very similar logic. If we look at the Ledesma case that's talked about in the briefing, Ford Motor Company versus Ledesma, and that was reversing a pattern charge on the instruction on proximate cause, which it had been in the books for 100 years because it omitted the essential element of substantial factor. And that's not that different from this situation here, because we have a pattern charge that doesn't have all of the elements of safer alternative design, of which the Texas Supreme Court indicated that a plaintiff must present evidence. And it's particularly important is that second factor that they indicated should be, that there must be evidence on. And that is a design that would not have been less safe in other circumstances and increased the risk to other users. Now, this particular element was not by accident, because the court emphasizes this element in a couple different ways, saying that it's not sufficient that an alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also introduce into the product other dangers of equal or greater magnitude. When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. And this is what we broadly refer to as this overall safety instruction. And so as to which of the four alternative designs that were presented, would that apply? It applied to three of the four. And that was exactly how Textron defended its product at trial, because, again, we're looking at Textron's product, and we're going to compare Textron's product to these other products. So Textron gets accused of saying, you've got this old product, here's all these alternatives. And Textron's defense at trial was, and this is to quote Mr. Jim Fisher, the corporate representative, a design that fixes this and causes that is not a fix. Quote, they all have their negatives. So let me run down this list, and here's the evidence of what the tradeoffs were, and this is why this was so important to not get this instruction. Disengaging that kickoff feature. The testimony was at trial that if you disengage that kickoff feature and it doesn't release the parking brake, people just get in the car, push on the gas, and they drive through the brakes, and it ruins the brakes. And, in fact, Nick Moore, a Textron senior product manager, testified that he had seen it happen with similar utility carts after Textron acquired bad boy buggies. And that testimony came from several other witnesses. So it was a tradeoff. So if you disengaged it, you're just going to create a different problem. You're going to wear out the brakes faster, and that's a safety problem. The operator presence switch in the seat. That, too, had tradeoffs because it had been tried. It didn't work. You have to calibrate it for everybody. So you pick someone who's small, someone who's big, someone in between, and it has to be calibrated so that when there's a shift in the weight in the seat, it's not too much to shut the engine off because otherwise it backfires, it stalls, and, of course, that happens at the most inopportune time. So the testimony there was, quote, negatives outweigh the positives. You can do it, but it creates problems you cannot correct. Tried, and it didn't work. No one does it. Third one, pedal guards. This one is also argued to create bigger and greater risks in other situations. Now, this pedal guard, I have to admit that when I first thought it, I thought they were trying to cover the pedal, but it's not covering the pedal. It's nothing more than a piece of metal that is welded next to the accelerator. And you can see that in the pictures that are in the appendix. Now, that just creates a tripping hazard. So someone who's getting in to slide across the seat, and the seat's designed that to enter the cart from either side, it's a tripping hazard to bump into that particular guard in there, and that's why it's not used in the farm and ranch environment. So these were all things that were tradeoffs. There were pros and cons. These were why the Textron requested an instruction that said, a design is not safer under other circumstances. It would impose an equal or greater risk of harm than design at issue. And that's a statement that comes directly from Jeanne. So there was no question that the Textron's request instruction, it was a correct statement of law. What would you say was the primary alternative design that the plaintiffs emphasized at trial? The primary? The one that they had the most proof on was disengaging the kickoff feature. And, again, it has to be that way because before trial at the Dalbara hearing, their primary expert, Mr. Newbold, he had four alternatives, and he left the hearing being only able to testify as to one, and that was the kickoff feature. That is the one that he had actually tested. And the testimony on both of those was robust at trial. However, insisting upon all four alternatives was a consistent theme throughout the trial. So this is not a situation as in Muth v. Ford Motor Company. This is a situation where all of these were emphasized. And, in fact, in the reply brief, we go through the arguments during closing. And, again, counsel for plaintiff says, tells the jury, I don't need to go four for four. I only have to go one for four. And then he proceeds to go through each one of those four alternatives. I think I'm about out of time. Yes, you've saved time for rebuttal. Thank you. Thank you, Mr. Eady. Mr. Post? May it please the Court. The plaintiffs in this case presented one liability theory on design defect, and that was that the kickoff brake system was defectively designed. They presented four safer alternative designs as evidence to prove that single liability theory of design defect. That is not four separate liability claims. And I think that, in that sense, this case is controlled by the rule of well logics, which recognizes that when there's a single valid theory that is submitted to the jury, there is not an argument about presumed harm from commingling theories based on multiple factual allegations that would prove that theory. And so I think well logics is really the narrow controlling case here, and I notice it's not a rule that Textron actually confronts seriously in the reply brief. Textron confronts instead its view of the Griffin rule, which is distinct from well logics. If you think about this in the standpoint of a simple negligence case involving a car collision, a plaintiff may argue that a defendant was negligent in failing to keep a proper lookout, negligent in speeding, negligent in failing to apply the brakes. No one suggests that you have to get separate findings on each of those factual allegations of negligence. That's the same here. That's the well logics rule, and that should control this case. But let me also address the Griffin rule. Judge Owen, you asked about Griffin and the Supreme Court's rule that this concern about commingling theories is inapplicable when the challenge on appeal is that one theory was not supported by sufficient evidence. The reason, of course, is that Justice Scalia said jurors are well equipped to determine which theory is supported by the evidence, and we presume that they follow the instructions and do so. Now, we could have a theoretical debate about the extent to which that rule has been translated to the civil context, but there's no debate to be had because under this circuit's rule of orderliness, that Griffin principle has been applied to the civil context. The court did it originally in the Walther decision in 1992, and it has since recognized that Walther is circuit precedent. And I would just highlight for the court the Prestonbach decision, which recognized that Walther was authoritative precedent in a case like this one, where you had five allegations of negligence, and the appellant argued two of those five were unsupported. Also, the Advocare case by Judge Higginbotham, after his opinion in the Muth case, recognized that Griffin applied. In that case, you had an allegation of formal and informal fiduciary duties, and the appellant argued that there was no evidence to support one, but in Advocare, the court held because there was evidence to support the other under Griffin, there was no error. Finally, a case that's not cited in the briefing that I wanted to call to the court's attention, Rodriguez v. Riddell Sports. The citation is 242, Fed Third, 567. That's a 2001 opinion authored by Judge Smith. And in that case, the court followed Griffin and recognized Walther as establishing the rule that this whole doctrine of presumed harm is inapplicable when factual sufficiency is at issue. Now, the argument is made by Textron that this court has somehow returned to a former rule in the Muth case. Of course, that's not a stable legal proposition under this circuit's rule of orderliness because Walther was decided after Griffin, recognized that Griffin is the law. Walther has never been overruled. Muth did not even address Walther. So Muth could not have overruled that line of circuit precedent. But, in fact, Muth didn't have to confront that issue because in Muth, Judge Higginbotham said, there are two distinct design defects at issue, and it's evident that all of the evidence at trial was directed to one theory, and so he applied the reasonable certainty exception. And so Muth shouldn't be read as trying to retreat in any way from this circuit's precedent. It didn't have to decide that question. And in the McCaig decision a couple of years ago, Muth was simply cited for its general principles, but because the issue had not been preserved, there was no need for the court to address the controlling legal rules. So I think it's actually quite evident when you study the Fifth Circuit precedent closely that the Textron position is legally untenable. The final point I'll make on this, Judge Owen, you asked about the primary theory at trial, and I think Textron's counsel is right that the primary theory was always the theory of decoupling the linkage between the accelerator and the brake. But is it fair to say that all four alternative designs were stressed to the jury? It is fair that they were all addressed with the jury. I think that the emphasis was placed on decoupling the brake, but I certainly would acknowledge that all four theories were developed in the evidence and argued to the jury. And because counsel argued about one theory, that is the hand-operated parking brake, I will briefly address the evidence on that theory because that's an independent way to affirm here. The argument is made that there was somehow a deficiency in the proof on the ability to use this design with a comparable workhorse like the ST350 that was used here. That was simply a debate about utility for the jury. The jury heard evidence on both sides. They argue that this model of a hand-operated parking brake could not be translated to a hydraulic model. But, in fact, this very same hand-operated parking brake was a standard feature on a model that had comparable load capacity and a comparable speed rating. You can see that in the record at pages 14490-91 and 14949. Counsel argues about the economic feasibility of this modification. The evidence at trial was that it would only cost an additional $7 to add the key elements. And you can see that in the record at page 14491. Now, of course, there was a dispute about this. Textron's witnesses wanted to deny that it would be portable to a mechanical braking system. But that was a dispute for the jury to decide. Recall that Textron conceded that it did not challenge technical feasibility. It specifically said in both of the Rule 50 motions, and specifically said to Judge Pittman when it presented its Rule 50 motions, we do not contest technological feasibility. So all of these arguments now about how they think it would be difficult to import this hand-operated parking brake to this particular design are waived. At best, what they had was a debate that they presented to the jury about the relative utility of doing what they acknowledged was economically and technologically feasible. And that was bringing a hand-operated parking brake into this model that would, through a kill switch, disable the ability of the accelerator to accelerate under these circumstances and would have prevented the accident. The arguments you heard from counsel are nothing more than a jury argument about the weight of the evidence. Let me turn, if the Court has no questions about that broad-form submission issue, to the jury instruction on the safer alternative design. I think the key rule here to remember is that the question that is squarely before the Court is whether a jury charge that specifically tracked not only the Texas pattern jury charge but the Texas statute defining safer alternative design, and which has never been questioned by any Texas court. Well, I've looked at the statute, and the Supreme Court's decision after that statute was passed, as I recall, was the same year, 2007, right? I'm not sure of the year in which the safer alternative design provision was passed, Your Honor. But the Supreme Court did add that extra element that's not in the statute, it looks like. I think not. I think that that's not the way I read the Genie opinion, because if you look in the Genie opinion at part three of the opinion that discusses the test for safer alternative design, at the beginning of that section where the Supreme Court explains what a safer alternative design is, it cites precisely the statutory definition, and it cites to the statute. That is the legal rule. It then goes on to say, in showing safer alternative design, a plaintiff cannot introduce a design that would reduce overall safety. At the end of that section, after the Court has discussed the evidence, in a bit of dictum, candidly, the Court lists the four elements that it says were required by the evidence. But that's not associated with any legal analysis. It's not associated with any authority. And the Court is not holding that there was a deficiency. The Court is actually holding that there was evidence of safer alternative designs. So I think that what Textron has done here, good lawyers, and I credit them, they have cherry-picked an attractive bit of dictum out of the opinion. But it's not the statement of the legal rule at the beginning of part three where the Supreme Court follows the statutory definition. And I think the key here – Well, but usually, as you know, when we're interpreting decisions of the highest court of a jurisdiction, we give a lot more credibility to dictum because we assume that the Court was speaking beyond the case immediately before it to some kind of broader principle. So we don't discount dictum in the same way that we might discount a routine panel opinion from this Court. Understood, Your Honor. And I certainly understand that the Texas Supreme Court's decisions offer significant guidance here. My point is simply to say that dictum should not be overread as suggesting that there is an additional element that changes the definition of a safer alternative design from the definition that the legislature itself had adopted. When you can see in the Genie opinion itself that the Court at the beginning of its legal analysis actually states precisely the legislative definition. Now, this element about what they characterize as overall safety is not something new to Texas law. It didn't originate in Genie. It originated in the Unaroyal decision in 1998. And the Unaroyal decision was review of a jury verdict that had been submitted under a conventional design defect instruction. The Supreme Court didn't say in Unaroyal that it was changing the elements of a design defect. It never has said since that Unaroyal changed the elements of a design defect. Genie did not say that these were additional elements of a design defect case. And, in fact, it's not a surprise that the pattern jury charge has followed the legislative definition of safer alternative design since Unaroyal without ever a suggestion that it varied in any way from the applicable statement by the Texas Supreme Court. I think it's significant that even today after Genie, the pattern jury charge has not been amended. And, in fact, the pattern jury charge quotes Genie in support of its statement of the safer alternative design rule. The suggestion I would make to this Court is that your... That's not a court-approved process. I mean, we know that. Absolutely. And it's that the Court never does, the Supreme Court has just never given much deference to the pattern jury charge. Well, Your Honor... And that's just a matter of... It certainly is not a court-approved process. I would point out that in the Ledesma decision itself, to which counsel alluded, Justice Willett, in writing the opinion for the Court, the Court said, we very rarely disapprove Texas pattern jury charge submissions. And in Ledesma, the Court made a specific point to say the Texas pattern jury charge on manufacturing defect is wrong, the definition of producing cause is wrong, and we order that the charge be changed for trials in Texas courts. The Court didn't do anything like that in Genie. Well, that wasn't an issue. It wasn't, but, Your Honor, I think that the point is that if the Court had believed the cases needed to be submitted differently, it would have said so. Remember that Genie was itself submitted under the Texas pattern jury charge definition of safer alternative design, and the Court regarded its jurisprudence about safer alternative design as enforcing and informing its analysis of the sufficiency of the evidence, but not that it was an additional element. And the point that I would make to the Court is this is a question of jury instructions over which the district judge has discretion. And unless you believe there is a substantial and any radical doubt that the jury has been misled, the district judge has discretion. I think that a federal district judge must have discretion to follow the Texas pattern jury charge when it has never been questioned by any Texas court, unless there is a definitive statement from the Texas Supreme Court that that is no longer Texas law. And I think Genie is anything but a definitive statement on that point. Let me also address, I think, one of the reasons why Textron is over-reading this instruction. It is that the PJC instruction itself fairly covers the argument that they want to make. They had the opportunity to make it. Remember that when an instruction is refused, the question for this Court is whether the issue was substantially covered by the instructions that were given. And here, following the pattern jury charge and the legislative definition, the district court instructed the jury that an alternative design could not substantially impair the product's utility. Now, courts have repeatedly recognized that arguments about whether an alternative design would be unsafe go to the question of impairment of a product's utility. This Court recognized that connection in its Smith decision in 2001, and it recognized it again in its Hodges decision in 2006. Whether an alternative design would impose different risks is part of the analysis of whether that design substantially impairs the utility of the product. That is in the pattern jury charge instruction. That instruction was given to the jury. Counsel was able to argue that instruction. And so I think that this is exactly the kind of situation where this Court has repeatedly held a litigant is not entitled to its preferred instruction, even if it's a correct statement of the law. I think that in this respect, the Bomarito decision from the Fifth Circuit is attractive because that's a case where the appellant argued it was entitled to an additional instruction that was a correct statement of the law. And the Court said, citing its long line of precedent, you're not entitled to every legally correct charge. You're only entitled to a fair charge. And the district judge said this issue was implicitly included within the instructions that were submitted, and that was within his discretion. I think that's exactly the same in this case. Last point I'll make on this is that when there is a complaint about refusal to instruct the jury, it is not enough to show an abuse of discretion, which I submit Textron cannot show in this context. There must also be a showing that the defense was substantially impaired. And there was no substantial impairment here for two distinct reasons. The first is, as I've said, Textron had the ability to make this argument under the instructions that they were given, and it made the argument. If you look at the record at pages 16334 and 16337-38, you will see that defense counsel in closing argument makes exactly the argument that you're hearing today from the podium, exactly the argument that he had the ability to make under the instructions about substantial impairment of utility. When he presented his case to you, he argued, and I wrote it down, that there are tradeoffs and pros and cons. That's about impairing the utility. That's about weighing the risk versus the utility of a product. That's not some unique overall safety consideration. They made their argument about overall safety within the context of these instructions. They simply lost. Yes, Your Honor. Risk versus utility is a different inquiry to me than whether an alternative design might be safe for this person but create issues for a different user. Those are different things to me, at least. There may be some overlap, but the spheres are somewhat different. I understand the intuition. But, in fact, if you look at the cases applying the risk-utility test, recall that within the common law risk-utility test, one of the factors at common law to be weighed is always whether there was an alternative that would have minimized this risk without increasing other risks adversely. What the Texas legislature did when it adopted its statute on safer alternative design was to say that proof is necessary, not just one factor. Well, I haven't gone back. I think we had all this debate in Ford Motor Company years ago. True. The law has substantially evolved, particularly on the jury instructions of the jury. I mean, what used to be given to the jury in Texas was, I thought, facially inadequate to develop any of these arguments. And, of course, that's been remedied to some degree. It has been. It's been evolving, so I don't think it's fair to say that the course would not be amenable to further granulation or evolution of the jury charge in the products case, considering where we came from. I think in the context of the Texas practice, remember that the legislature has evolved the submission on design defect. The Supreme Court has never changed the design defect instruction. It has simply recognized the legislature dictated an additional definition of safer alternative design in an element. I thought years ago it was a very, very truncated jury question. Your Honor, the difference now in the pattern instruction is really only the addition of the legislatively dictated definition of safer alternative design and the requirement that it be shown. But what the Texas Supreme Court might decide is appropriate for submission at a Texas trial is not the question in a federal diversity case where a federal district judge has discretion to instruct the jury. The last point I was going to make, though, was about substantial impairment because counsel argued that there were safety concerns with respect to these alternative designs. I submit he had the chance to make those arguments to the jury under these instructions. He was not harmed. But it's important to recognize these were not even serious safety concerns. These are, at best, maintenance or utility concerns. The argument about removing the linkage, creating wear and tear on the brakes, now, remember, that's not a very serious argument. That's not something they even put in the best protection letter when they were recommending precisely this fix. And the evidence showed there wouldn't be wear and tear on the brakes. But even if you credit it, that's an argument about maintenance costs on the vehicle. That's not an argument about a risk of equal or greater magnitude. With respect to the OPS switch, they argued there would be backfiring. He said, I quote, the negatives outweigh the positives. That's a risk-utility balancing argument, squarely within the language of the PJC instruction. That's not an argument about safety at all. That's simply an argument about utility. Well, if your engine cuts out while you're on a rocky hill, it could certainly be a safety issue. Well, Your Honor, and counsel could make that argument, and he made it. But it's a very remote argument. In virtually any practical context, at best it is an inconvenience and a matter of utility. The final point that I would make is, they make this argument about tripping hazards with the pedal guards. They themselves offer the pedal guards as one of their options, and they conceded at trial they have no reported incident of any hazard. There is no substantial impairment and no abuse of discretion. The judgment should be affirmed. Thank you, Mr. Post. Mr. Eadie, you've saved time for both. May it please the Court. Let's begin with that last part on whether or not not getting that instruction on safer alternative design on overall safety impaired Textron's defense at trial. It most certainly did, because Textron could not argue to the jury that under Texas law a plaintiff is required to prove, as part of their safer alternative design, the existence of a design that would not have been less safe in other circumstances and increased the risk to other users. Because both the Texas Supreme Court, this Court, and Casey v. Toyota have said it's not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would have also introduced into the product other dangers of equal and greater magnitude. The charge the jury received in this case, they just had to find, to answer yes to question number one, they just had to find existence of any alternative design that would have prevented the injury to Mrs. Nestor without any consideration whatsoever of any equal or greater harms. In Jeanne Industry, the court very specifically says a plaintiff must have presented evidence. This is pretty clear. Must have presented evidence. And then the court says, number one, what they have to present, number two, number three, number four. They lay it out as elements. And that was the objection to the court's charge. This is an essential element.  The jury should have received that instruction. Ultimately, after the trial and after the evidence was put on by Textron of the tradeoffs in safety with the different designs, it didn't make any difference given the court's instructions to the jury because that wasn't a consideration at all. They just had to find a design that would have prevented Mrs. Nestor's injuries. Turning to the issue on whether or not it was economically feasible to use this handbrake, the argument being it's $7 for a switch. Well, that's the switch that goes into the end of the handbrake. And, yes, it costs $7, but this court in the Casey v. Toyota case held that to establish economic feasibility, the plaintiff must introduce proof of the cost of incorporating this technology. And that cost is moving a hydraulic brake over to a mechanical braking system, and there's no evidence on that. Now, there was evidence on this other cart called an ST-480. I thought it was the other way around. I thought it was moving a mechanical brake to a hydraulic. Hydraulic brake, that's where the handbrake is on the hydraulic system. That's on the bigger cart. It's hydraulic, yeah, but it's mechanical under the facts of this case. Right. The Nestor's cart is a mechanical braking system. And so that's the problem about trying to put a completely different braking system into the existing system. No one knew how to do it, and it hadn't been done. Now, if you want to jettison the mechanical system, well, then that's no longer the Nestor's cart. That's the bigger cart with the more robust braking system that goes at the higher speeds. And the cost of doing that was never introduced, and that was necessary. That's the cost of incorporating the technology. What would you say about ST-480? Yes, the ST-480 is a different model vehicle utility cart. It has hydraulic brakes. It has a higher speed. It is a more robust vehicle. So when you're referring to- How much does it cost? The record does not reflect how much the ST-480 reflects. The record reflects that the higher, bigger carts with hydraulic brakes cost between $13,000 and $14,000. The last issue is the first one I believe the Council addressed that is worth discussing, and that's the Griffin Rule. The linchpin here really goes all the way back to this Walther's opinion, and that seems to be where the argument is. Things took a different path. We followed the Baldwin principle, Baldwin principle, Baldwin principle, and then all of a sudden Griffin came out, and there was this discussion in Walther's. Well, if you read the opinion on rehearing in the Walther's case, and this is where it becomes very clear what happened because it's- I'm going to quote this because it's worthwhile. It says in the opinion on rehearing, this Court recently held, reversing a number of earlier cases, that a jury verdict may be sustained even though not all decisions, not all the theories on which it's been submitted had sufficient evidentiary support. Walther purported to be applying the Supreme Court's decision in Griffin. Although its reasoning may be questioned, well, this is in Prestenbach, Walther appears to be authoritative, but if we go back to the Walther's opinion on rehearing, what it actually says is that- The fact is that Walther did not rely on statistics alone at trial to prove his case. Under these circumstances, we will not assume the jury disregarded other evidence in the record and relied solely on statistics in reaching its conclusion. Jurors are well-equipped to analyze the evidence and reach a decision despite the availability of factual unsupported theory in the jury instructions. Our discussion of Griffin borrowed this principle and nothing more. Wrap it up in one sentence, please, Mr. Eadie. There was no overruling of this Court's prior precedent following the Baldwin principle in the Walther case. The Prestenbach footnote that I quoted a minute ago is an over-reading of that and that explains why we see the Baldwin principle being applied in its fullest extent in Muth and McCaig. All right. Your time has expired now. Your cases and all of today's cases are under submission.